1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
9                            AT TACOMA

10   LLOYD J. BOYD,
                                              CASE NO.    C08-5514KLS
11                    Plaintiff,
                                              ORDER REMANDING THE
12        v.                                  COMMISSIONER'S DECISION
                                              TO DENY BENEFITS
13   MICHAEL J. ASTRUE, Commissioner of
     Social Security,
14
                      Defendant.
15

16

17

18        Plaintiff, Lloyd J. Boyd (hereinafter "plaintiff"), has brought this matter for judicial review of the

19   denial of an application for disability insurance benefits and an application for supplemental security

20   income ("SSI") benefits originally filed by his son, James L. Boyd (hereinafter "the claimant").  The

21   parties have consented to have this matter be heard by the undersigned Magistrate Judge pursuant to 28

22   U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and Local Rule MJR 13.  After reviewing the parties'

23   briefs and the remaining record, the undersigned hereby finds and ORDERS as follows:

24                          FACTUAL AND PROCEDURAL HISTORY

25        The claimant protectively filed an application for SSI benefits on October 8, 2004. Tr. 32, 266-68.

26   He also filed an application for disability insurance benefits on November 3, 2004. Tr. 32, 97-99.  The

27   claimant alleged disability as of April 15, 2004, due to a bipolar disorder, a post traumatic stress disorder

28   ("PTSD") and hepatitis C. Tr. 32, 104.  Both applications were denied initially and on reconsideration. Tr.

ORDER
Page - 1

32, 46, 49, 84, 87, 269-70, 274-75.  While the claimant did request a hearing before an administrative law judge ("ALJ"), he died on November 24, 2005, at the age of 31 due to clostridial necrotizing fasciitis, which was reported to have been caused by "chronic injection drug abuse." Tr. 32.

On September 20, 2006, plaintiff filed a notice of substitution of party for the claimant in regard to the disposition of the claimant's applications. Id.  On October 19, 2006, a hearing was held before an ALJ, at which the claimant's legal counsel appeared, plaintiff himself did not, and at which a vocational expert appeared and testified. Tr. 277-85.  On November 28, 2006, that ALJ issued a decision determining that the claimant would be disabled if his substance use was taken into consideration, but that if he had stopped such use, he would have had no severe impairment, and therefore he was not disabled at any time through the date of his death. Tr. 32-45.

Plaintiff's request for review of the ALJ's decision was granted on June 13, 2007, by the Appeals Council, which remanded the matter to further consider the medical evidence in the record, to further evaluate the claimant's mental impairments, to obtain evidence from a medical expert, and, if warranted by the expanded record, to obtain supplemental evidence from a vocational expert. Tr. 26-28.  On remand, a supplemental hearing was held on November 28, 2007, before another ALJ, at which plaintiff's attorney again appeared on behalf of the claimant, and at which a medical expert and a different vocational expert appeared and testified. Tr. 286-316.

On February 29, 2008, the ALJ issued a decision, determining the claimant to be not disabled, finding specifically in relevant part that:

(1)  at step one of the sequential disability evaluation process,[1] the claimant had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)  at step two, the claimant had "severe" impairments consisting of polysubstance abuse, a mood disorder and a possible bipolar disorder;

(3)  at step three, the claimant's impairments, including his polysubstance abuse disorder, met the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"), §§ 12.04 and 12.09, but if he had stopped his substance use, he would not have had an impairment or a combination of impairments that met or medically equaled any of those set forth in the Listings;

(4)  after step three but before step four, if the claimant had stopped his substance

---

[1]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

use, he would have had the residual functional capacity to perform a full range of work at all exertional levels, with certain additional non-exertional limitations; and

(5) at step four, if the claimant had stopped his substance use, he would have been able to perform his past relevant work.

Tr. 12-20. The ALJ further found that because the claimant would not have been disabled if he had stopped his substance use, that use was a contributing factor material to the determination of disability, and therefore he was not disabled. Tr. 19-20. Plaintiff's request for review of the second ALJ's decision was denied by the Appeals Council on June 19, 2008, making that decision the Commissioner's final decision. Tr. 5; 20 C.F.R. §§ 404.981, 416.1481.

On August 21, 2008, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#5). The administrative record was filed with the Court on December 16, 2008. (Dkt. #15). Plaintiff argues the ALJ's decision should be reversed and remanded for further administrative proceedings for the following reasons:

(a) the ALJ erred in finding the claimant's substance use was a material factor in her determination of disability;

(b) the ALJ erred in failing to apply the special evaluation rule for mental impairments as required by 20 C.F.R. § 404.1520a;

(c) the ALJ failed to provide proper reasons for giving greater weight to the medical expert's opinion than to those of his treating and examining physicians;

(d) the ALJ erred in failing to consider the claimant's post traumatic stress disorder in assessing his ability to perform work activity;

(e) the ALJ erred in assessing the claimant's credibility;

(f) the ALJ erred in evaluating the lay witness evidence in the record; and

(g) the hypothetical question the ALJ posed to the vocational expert did not take into account all of the claimant's non-exertional limitations.

For the reasons set forth below, the undersigned agrees the ALJ erred in determining the claimant to be not disabled, and hereby finds that the ALJ's decision should be reversed, and this matter should be remanded to the Commissioner for further administrative proceedings. Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

<u>DISCUSSION</u>

This Court must uphold the Commissioner's determination that the claimant is not disabled if the

Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.      The ALJ Erred in Finding the Claimant's Substance Use to Be Material to the Determination of Disability

A claimant may not be found disabled if alcoholism or drug addiction would be "a contributing factor material to the Commissioner's determination" that he or she is disabled. Bustamante v. Massanari, 262 F.3d 949, 954 (9th Cir. 2001) (noting that Social Security regulations also require determination as to whether drug addiction or alcoholism is contributing factor material to finding of disability) (citing 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); quoting 20 C.F.R. § 404.1535(a), § 416.935(a)). To determine whether a claimant's alcoholism or drug addiction is a materially contributing factor, the ALJ first must conduct the five-step disability evaluation process "without separating out the impact of alcoholism or drug addiction." Id. at 955.

If the ALJ finds the claimant is not disabled, "then the claimant is not entitled to benefits." Id. If the claimant is found disabled "and there is 'medical evidence of [his or her] drug addiction or alcoholism,'" the ALJ proceeds "to determine if the claimant 'would still [be found] disabled if [he or she] stopped using alcohol or drugs.'" Id. (citing 20 C.F.R. § 404.1535, § 416.935). Thus, if a claimant's current limitations "would remain once he [or she] stopped using drugs and alcohol," and those limitations are disabling, "then drug addiction or alcoholism is not material to the disability, and the claimant will be deemed disabled." Ball v. Massanari, 254 F.3d 817, 821 (9th Cir. 2001).

Plaintiff argues that in finding the claimant's substance use to be material to the determination of disability, the ALJ failed to properly consider evaluations performed by Kimberly Wheeler, Ph.D., and Frank L. Seibel, Psy.D., which plaintiff asserts, indicate continuing disabling mental conditions despite the claimant being in remission from substance use at the time. Although, for the reasons set forth below, the

Court agrees that the ALJ erred in his assessment of Dr. Wheeler's and Dr. Seibel's evaluations, the Court does not agree that those evaluations necessarily establish the claimant suffered from continuing disabling mental conditions in the absence of such use.

In late October 2004, Dr. Wheeler diagnosed the claimant with both a bipolar disorder and opioid dependence/polysubstance dependence in early full remission. Tr. 214. In regard to the latter, Dr. Wheeler stated the claimant had been "clean" for less than three and a half weeks, with "2-3 slips" occurring since leaving a substance abuse treatment program in mid-August 2004, after spending 57 days there. Id. The claimant further reported that he self-medicated with drugs, which were the only things that made him "feel good." Id. Dr. Wheeler opined that the above diagnosed conditions imposed on the claimant a severe limitation on his ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting, a marked limitation on his ability to relate appropriately to co-workers and supervisors, and mild to moderate limitations in several other functional areas. Tr. 215. In addition, Dr. Wheeler felt that the "[s]ide effects/malaise" from the claimant not yet being able to find the "right balance" of medications, increased his risk of "opioid relapse." Tr. 216.

With respect to Dr. Wheeler's findings, the ALJ found as follows:

> Kimberly Wheeler, Ph.D., prepared a check-box [Washington State] DSHS [Department of Social and Health Services] form on October 27, 2004, diagnosing the claimant with a bipolar disorder, polysubstance dependence, and other possible ("rule-out") conditions: schizoaffective disorder and personality disorder. She opined these impairments caused mild to moderate cognitive limitations, and moderate social limitations with marked difficulty interacting with co-workers and supervisors, and severe limitations tolerating work stresses (exhibit 8F:7-9). Dr. Wheeler noted comprehension was intact, concentration effortful and fund of knowledge reasonable but also noted fair impulse control and impulsive problem solving. This conflict as well as the claimant's report that he was clean from drug use for only the prior 3½ weeks, reduces the probative value of this opinion. (exhibit 8F:7).

Tr. 16. Plaintiff takes issue with the ALJ's statement that the probative value of Dr. Wheeler's opinion was reduced by the claimant having reported being clean from drug use "for only the prior 3½ weeks" at the time. In contesting that statement, plaintiff places much emphasis on Dr. Wheeler's comment that the claimant's polysubstance dependence was in early full remission. Given the fact that such remission had been in effect for less than a month at the time, and in light of the other evidence in the record discussed below concerning the nature of the claimant's on-going substance use, it was not necessarily unreasonable for the ALJ to call into question the strength of that remission.

Plaintiff in essence is equating the description of the claimant's polysubstance dependence as being "in early full remission" used by Dr. Wheeler here, with a medical finding that such dependence no longer had any significant effect on the claimant's mental functioning. By doing so, however, plaintiff both takes that phrase out of context of Dr. Wheeler's opinion as a whole, and ignores the substantial evidence in the record indicating the claimant's substance abuse not only was continuing at the time, but also impacted his mental capacities to a significant degree. As noted by the ALJ in finding the claimant's substance abuse to be material to the determination of disability:

> . . . the claimant had an extensive history of IV drug abuse with abscesses, manic and depressive symptoms, and marked limitations in social functioning, concentration, persistence, and pace (exhibits A; 2F). He had a history of treatment for polysubstance dependence (exhibit 1F). He was treated at Pioneer Human Services from June to August 2004; for polysubstance dependence and a bipolar disorder, but was discharged after he stopped compliance with the program. He reportedly may have been decompensating at the time (exhibit 1F:3-5).

> The claimant was treated [from early June 2004, through late October 2004,] by Joy Ruiz-Molleston, M.D., who diagnosed the claimant with bipolar disorder, depression, polysubstance abuse, and other symptoms (exhibit 3F). Dr. Ruiz-Molleston also noted schizophrenia (exhibit 3F:5), but that was likely a symptom complex from acute heroin abuse and withdrawal (exhibit 3F: 6-7).

Tr. 15-16. Thus, it seems that the three and a half weeks of "early full remission" noted by Dr. Wheeler may have been much less complete, stable or sustained than plaintiff's argument implies it to have been. Indeed, Dr. Wheeler herself noted the claimant reported having had "2-3 slips" since being discharged from the treatment program in mid-August for non-compliance, that he used drugs to self-medicate, and that he was at risk for relapse.

In addition, while Dr. Wheeler did list the claimant's bipolar disorder diagnosis separately from that of his polysubstance dependence, this does not in itself mean, as plaintiff asserts, that Dr. Wheeler believed the former diagnosis was not caused or otherwise affected by the latter. Even if plaintiff is correct here, Dr. Wheeler did not explain which of the many mental functional limitations she found were due to the bipolar disorder and which to the polysubstance dependence diagnosis. In addition, the comments concerning the claimant's most recent substance use history offered by Dr. Wheeler indicates she did feel the claimant's polysubstance dependence was a lot less under control than plaintiff would describe it to have been at the time. Likewise, although Dr. Wheeler indicated – by checking a box on the state agency evaluation form she completed – that the claimant was "[se]riously disturbed" (Tr. 216), there

is no evidence that this was not attributed at least in part to the claimant's substance abuse.

Other evidence in the record also shows the claimant's substance use and abuse was far from being in full or sustained remission around the time of Dr. Wheeler's evaluation report. In early June 2004, for example, the claimant was seen in the emergency room, where he reported "currently using about 1 gm of heroin per day," and continuing "to use injectable heroin." Tr. 172. He also stated that the longest period of time during which he had remained "clean" was seven months. Tr. 182. As noted by the ALJ, in mid-August 2004, while in drug treatment, the claimant was found to be showing "signs of being in relapse mode." Tr. 157. It further was reported at the time that the claimant then "absconded from" and "failed to return to" treatment, resulting in him being discharged therefrom "for leaving against program advice." Id. His prognosis was noted to be poor due to the "chronicity and intensity of addiction." Id.

In late August 2004, and again one month later, the claimant was diagnosed as being in "[h]eroin withdrawal." Tr. 180-81. He was assessed as having "[d]rug dependence, continuous use," and "[o]pioid type dependence" in late December 2004, along with "[d]rug withdrawal syndrome" and "[d]rug-induced dementia." Tr. 212. In late January 2005, the claimant reported having used intravenous drugs "until about a year ago" (Tr. 184), which clearly conflicts with the evidence in the record discussed above concerning his use of injectable heroin. Indeed, at the time he was noted to have "fresh track marks across the veins of the wrist and hands," and later admitted to "occasionally" using methamphetamine intravenously. Tr. 184, 187. In early February 2005, the claimant was reported to have been hospitalized "for an overdose twice in the last eight days," and was diagnosed with "[d]rug dependence, continuous use." Tr. 210. Finally, in late March 2005, he was seen with a chief complaint of "heroin addiction," along with "[a]ssociated signs and symptoms" that included "aching, mood swing and heroin withdrawal." Tr. 208.

Accordingly, it is quite clear that the record contains substantial evidence showing that for several months both before and after late October 2004, when the claimant was seen by Dr. Wheeler, not only did his polysubstance abuse apparently continue, but associated mental health symptoms of a significant nature were observed to have occurred as a result of that abuse as well. For the same reasons, the Court finds that the evaluation report issued by Frank L. Seibel, Psy.D., in late February 2005, fails to show the claimant's substance use was in full, stable remission at that time, again as argued by plaintiff. Dr. Seibel diagnosed the claimant with a bipolar disorder, chronic PTSD, social phobia, polysubstance dependence in early full remission, and a global assessment of functioning ("GAF") score of approximately 45. Tr. 193.

Dr. Seibel noted that the record showed the claimant used a gram of heroin per day in early June 2004, and that he left his drug treatment program prior to its completion in mid-August 2004. Tr. 189.

Dr. Seibel opined, however, that the claimant's substance use history appeared "to have left him without the inner resources and coping strategies necessary to cope with the day to day stressors of life." Tr. 194. In addition, Dr. Seibel felt that the claimant "should . . . be involved in ongoing substance use treatment to decrease the potential for a relapse." Id. In terms of the claimant's prognosis and functional assessment, Dr. Seibel concluded in relevant part as follows:

> The prognosis for this claimant is currently guarded. He has a long history of substance dependence and is currently presenting with significant mental health problems. The primary concern would be a return to the use of alcohol and/or drugs. Also of concern is his lack of adequate social support. He clearly needs a good support system to help him remain clean and sober and also to support him as he continues in mental health treatment. . . . Currently, his ability to focus and concentrate, as well as his pace and persistence, appear mild to moderately impaired due to symptoms of depression and anxiety. He does appear able to follow both simple and complex instructions. His ability to get along appropriately with others may be mildly impaired due to his social anxiety and symptoms of Posttraumatic Stress Disorder. The claimant would likely have difficulty tolerating the stress of a work environment due to the symptoms of his mental disorders and his current medical problems. Of primary concern right now would be a relapse to his use of drugs or increased symptoms of depression and anxiety due to increased stress. . . .

Tr. 194-95.

As with Dr. Wheeler, plaintiff focuses on Dr. Seibel's statement that the claimant's polysubstance abuse was in "early full remission" as evidence that substance abuse was not a material factor at that time. But, as discussed above, the evidence in the record overall for the period of early June 2004, through late March 2005, reveals that such use was on-going, resulting in at least some significant mental health signs and symptoms. Also as with Dr. Wheeler, Dr. Seibel himself noted the precarious nature of the claimant's early remission, specifically stating that his primary concern in terms of prognosis and future functioning was that of potential relapse. It is true that a GAF score of 45 does indicate a serious impairment in mental functioning.[2] Dr. Seibel, however, fails to indicate whether that low score applied regardless of the lasting effects of the claimant's "long history of substance dependence."

---

[2]"A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 34); see also Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007) ("[A] GAF score in the forties may be associated with a serious impairment in occupational functioning.")

Plaintiff further argues that implicit in Dr. Seibel's concluding remarks is an opinion of inability to engage in gainful employment, because he found the claimant would have difficulty tolerating the stress of a work environment due to the symptoms of his mental health disorders and medical problems. First, it is not at all clear what Dr. Seibel meant here by those terms, and whether he included therein the claimant's polysubstance dependence and/or effects of his history thereof. Second, as noted above, Dr. Seibel earlier in his evaluation report also commented that the claimant's substance use history appeared "to have left him without the inner resources and coping strategies necessary to cope with the day to day stressors of life." Tr. 194. As such, it is not at all clear that Dr. Seibel based his opinion that the claimant would have difficulty tolerating work stress solely on those impairments other than substance abuse.

The Court does find, however, that the findings of Dr. Wheeler and Dr. Seibel discussed above, do call into question the ALJ's determination that the claimant's continuing substance abuse rose to the level of materiality required to make a finding of non-disability on the basis thereof. For example, although, as discussed above, Dr. Wheeler's evaluation report does indicate the fragility of the claimant's remission at the time thereof, and she does not attribute the mental functional limitations she found specifically to one diagnosis or the other, it also is not clear whether Dr. Wheeler believed the claimant continued to exhibit significant remaining limitations separate from his substance abuse history and diagnosis. The same can be said in regard to Dr. Siebel and his findings. Indeed, the ALJ did not expressly discount his findings on the basis of the claimant's continuing substance abuse, and, as discussed in greater detail below, failed to give valid reasons for rejecting the more severe limitations he imposed on the claimant. Accordingly, the Court finds that remand for further consideration of this evidence is warranted.

II.    The ALJ Properly Applied the Special Evaluation Rule for Mental Impairments

At step two of the sequential disability evaluation process, the ALJ must determine if a claimant has a "severe" impairment. Id. An impairment is deemed "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), (c), § 416.920(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. If the claimant does have a severe impairment, then at step three of the sequential disability evaluation process, the ALJ must evaluate his or her impairment or impairments to see if the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"), are met or equaled. 20 C.F.R § 404.1520(d), § 416.920(d);

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. Id.

To evaluate the severity of a claimant's mental impairment or impairments at both steps two and three of the sequential disability evaluation process, the Commissioner must "follow a special technique at each level in the administrative review process." 20 C.F.R. § 404.1520a(a), § 416.920a(a). Under this technique, at step two, the Commissioner determines whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1), § 416.920a(b)(1). If the claimant is found to have such an impairment, then the Commissioner rates the "degree of functional limitation" resulting therefrom. 20 C.F.R. § 404.1520a(b)(2), § 416.920a(b)(2).

Rating the degree of functional limitation involves consideration of four functional areas: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c), § 416.920a(c). If the degree of limitation in the first three areas is rated "none" or "mild" and "none" in the fourth area, then the claimant's mental impairment generally is considered to be not severe, unless evidence in the record otherwise indicates there is more than a minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1), § 404.1520a(d)(1).

If the impairment is found to be severe, the Commissioner, as noted above, next determines if it meets or equals the criteria of any of the impairments set forth in the Listings. 20 C.F.R. § 404.1520a(d)(2), § 416.920a(d)(2). If a listed impairment is not met or equaled, the claimant's residual functional capacity will then be assessed. 20 C.F.R. § 404.1520a(d)(3), § 416.920a(d)(3). At the initial and reconsideration levels of the administrative review process, "a standard document" is completed to record how the above technique was applied. 20 C.F.R. § 404.1520a(e), § 416.920a(e). At the ALJ hearing level, documentation of the technique is done in the decision itself. Id.

Plaintiff argues the ALJ failed to apply the required special technique described above in this case. Specifically, he asserts the ALJ merely stated in his decision that "[w]ithout the effects of substance abuse, the claimant would continue to have more than minimal limitations in functioning." Tr. 18. In so limiting himself to this statement, plaintiff claims the ALJ erred by failing to take into consideration the functional limitations found by Dr. Wheeler and Dr. Seibel, and by not making any specific findings concerning the four functional areas noted above.

The Court finds plaintiff's claims here to be without merit. First, in terms of the step two severity determination, although that determination merely consisted of the statement quoted above, based on that statement the ALJ did find the claimant continued to have severe impairments. As such, the Court fails to see any prejudice to the claimant here, even if there was error, given that the ALJ then went on to make her step three determination. See Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion). Second, the ALJ did apply the special technique in his step three analysis, finding specifically at that step that "if the substance abuse was stopped," the claimant would have moderate restrictions in his activities of daily living, moderate difficulties in both social functioning and concentration, persistence or pace, and no episodes of decompensation. Tr. 18.

III.    The ALJ Erred in Adopting the Opinion of the Medical Expert

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific

and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

At the second hearing, the medical expert, Dr. Arthur Lewy, testified that the claimant appeared to have "a mood disorder of some sort," possibly a bipolar disorder, possible PTSD, and "substantial poly substance abuse problems," with "at best" only partial remission. Tr. 294. Dr. Lewy further testified that considering and including drug abuse, the claimant was "probably not employable," because he could not "be consistent." Tr. 295. That is, he "was probably not capable of sustaining regular constructive activities on a regular basis." Id. Dr. Lewy also testified that while the claimant "endorsed auditory hallucinations" when he was seen by Dr. Wheeler, they were not "clearly present in the record," and Dr. Lewy's sense was that they probably would "mostly be due to his meth or cocaine abuse," which would not be expected "in some agitated mood disorder." Tr. 295-96.

Dr. Lewy testified that Dr. Wheeler's findings indicated that the claimant's "mental control" was not "grossly abnormal," that he did not "get a sense of a . . . highly disturbed" individual, and that he was not "real confident" Dr. Wheeler was able to observe the claimant "during a period of extended sobriety." Tr. 296. Dr. Lewy testified as well that it was not medically reasonable "to presume that" the claimant's substance abuse "had no bearing on reports of agitation" on his part. Tr. 297. While Dr. Lewy did testify

that "there would be ongoing mood and anxiety symptoms" independent of substance abuse, the medical evidence in the record failed to indicate the claimant's symptoms were "highly problematic." Tr. 298. Dr. Lewy further testified that the "reports of agitation and the like" were "in the context of" abuse of drugs, which "create those types of symptoms," and which again it was not "reasonable to presume that they had no effect on that symptomatology." Id.

In addition to "likely" contributing to the existence of "anxiety features" in the claimant, Dr. Lewy testified that "the types of drugs" that were being used by the claimant also could "mimic certain symptoms of mania." Tr. 302. Considering all of the claimant's impairments, including substance abuse, Dr. Lewy testified that in terms of functional limitations, he would rate the claimant as being markedly limited in "daily living and maintaining concentration, persistence and pace," "with moderate to marked limitations in social functioning," and thus that the criteria of the Listings had been met. Tr. 303, 305. In terms of episodes of decompensation, Dr. Lewy testified that he saw none in the record. Tr. 303. However, absent substance abuse, Dr. Lewy testified that he would "rate the functional limitations as moderate across the board and no change in episodes of decompensation." Tr. 304.

With respect to the claimant's "deficits in functioning in a work environment," Dr. Lewy testified that the claimant "would have been capable of completing relatively basic tasks involving two to four steps with . . . brief occasional co-worker contacts in the course of that work," "incidental brief occasional public contact" and "reasonable normative supervision," and "adapting within the context of a job that had pretty regular predictable routines." Id. In her decision, the ALJ found in relevant part as follows:

> The undersigned prefers the medical expert's testimony regarding the nature and severity of the claimant's conditions. The doctor is the only medical expert who reviewed the entire record . . . Because Dr. Lewy has a better foundation for his opinions than others found in the record, the medical expert's views are adopted . . .
>
> Based on Dr. Lewy's testimony, the claimant's mental impairments, including the substance use disorders, meet listings 12.04 and 12.09. . . .
>
> . . .
>
> Based on the testimony of Dr. Lewy, in activities of daily living, the claimant had marked restrictions. In social functioning, the claimant had moderate difficulties, possibly marked at times. With regard to concentration, persistence or pace, the claimant had marked difficulties. As for episodes of decompensation, the claimant experienced no episodes of decompensation. . . .

Tr. 17. In making the step three determination absent the claimant's substance abuse previously discussed

above, the ALJ also relied on Dr. Lewy's testimony for support. Tr. 18. In addition, the ALJ adopted the testimony of Dr. Lewy, again on the basis that he had "access to the entire file" in assessing the claimant with the residual functional capacity ("RFC") to "complete basic work tasks . . . involving 1-4 steps, with occasional, incidental public contact, and a predictable routine." Tr. 18-19.

Plaintiff argues the ALJ erred in giving greater, controlling weight to the testimony of Dr. Lewy, a non-examining medical source, than to those of Dr. Wheeler and Dr. Seibel, both of whom are examining psychologists. The Court agrees. Although it may be true that Dr. Lewy had access to the entire record, while Drs. Wheeler and Seibel did not, the ALJ did not discuss with any specificity exactly what evidence in the record supported Dr. Lewy's testimony. Certainly, as discussed above, there is substantial evidence in the record that the claimant's substance abuse has continued and has resulted in at least some significant mental functional signs and symptoms. That evidence, furthermore, potentially could constitute the "other independent evidence" necessary to allow a non-examining medical source opinion to constitute substantial evidence. See Lester, 81 F.3d at 830-31; Tonapetyan, 242 F.3d at 1149. Again, however, the lack of any detailed analysis on the ALJ's part here precludes the Court from making such a finding. Given the ALJ's errors in evaluating the opinions of both Drs. Wheeler and Seibel also discussed above, remand for further consideration of this issue is warranted as well.

IV.    The ALJ's Treatment of Plaintiff's Alleged PTSD Was Improper

Plaintiff argues the ALJ erred in not discussing whether the claimant had a medically determinable impairment consisting of an anxiety-related disorder – particularly PTSD – whether any such disorder was severe and what limitations, if any, were imposed on the claimant thereby. Plaintiff is incorrect in arguing the ALJ did not discuss whether the claimant had an anxiety-related impairment that was severe at step two of the sequential disability evaluation process. Specifically, the ALJ found at that step that:

> There is evidence that the claimant had anxiety, possibly post-traumatic stress disorder (PTSD) as a result of abuse as a child (exhibit 5F). That was based on subjective statements to an examiner. At the hearing, the medical expert opined that the claimant also had a [sic] anxiety disorder, with mention of social phobia. The medical expert was uncertain about the PTSD. However, the undersigned finds that the reports of anxiety and PTSD were related to drug use (exhibit 5F). Any anxiety was drug-induced, or occasioned during the claimant's periods of withdrawal from drugs. Schizophrenia was also noted in on [sic] report, but that was related to drugs. The symptoms of anxiety are from drug use only; he did not have a severe anxiety impairment or schizophrenia.

Tr. 15. The Court, though, cannot say for certain that the ALJ's step two analysis here is supported by the

substantial evidence in the record.

First, while it is true that Dr. Lewy initially testified at the second hearing as to only the possibility that the claimant actually had PTSD. Tr. 294. He went on to further testify, however, that independent of any established substance abuse, "there would be ongoing mood and anxiety symptoms" (Tr. 298), and that based on the medical evidence in the record, he would give the claimant a diagnosis of "anxiety disorder not otherwise specified with a rule out of PTSD" (Tr. 302). While Dr. Lewy did also testify that the record indicated those symptoms might not be "highly problematic," and that it was not "reasonable to presume" that the claimant's substance abuse "had no effect on that symptomatology" (Tr. 298, 302), it is clear that Dr. Lewy felt the claimant still suffered from an anxiety-related disorder separate from his substance abuse, and that he would have experienced at least some symptoms resulting therefrom.

Indeed, including both the claimant's affective and anxiety-related disorders, but without the effects of his substance abuse, Dr. Lewy testified that he "would rate the functional limitations [activities of daily living, social functioning, and concentration, persistence or pace] as moderate across the board," and more specifically that the claimant would be restricted to "occasional co-worker contacts" and "incidental brief occasional public contact," and would require "pretty regular predictable routines." Tr. 304. As discussed above, Dr. Seibel also diagnosed the claimant with chronic PTSD, finding that his current "ability to focus and concentrate, as well as his pace and persistence," appeared to be "mild[ly] to moderately impaired" due in part to his anxiety. Tr. 193-94. Dr. Seibel further found that due to the claimant's mental health disorders, including presumably the anxiety and PTSD, the claimant "would likely have difficulty tolerating the stress of a work environment." Tr. 195.

Although again there is some question as to the effect Dr. Siebel felt – and the record shows – the claimant's substance abuse had on his mental functional capabilities, Dr. Seibel's findings and opinion do constitute significant evidence indicating the presence of symptoms from one or more independent anxiety-related impairments. At least one other medical source in the record, furthermore, has found the claimant to have suffered from an anxiety-related impairment, seemingly separate from his substance abuse. In late January 2005, Howard Quint, M.D., assessed the claimant as having PTSD. Tr. 187. While Dr. Quint did find as well that this was accompanied by "active chemical dependency," and did not specifically impose any functional limitations as a result thereof, again it does present evidence of a

possible non-drug, anxiety-related impairment the ALJ should have taken into consideration.

Defendant admits the ALJ erred in finding the claimant had no severe anxiety-related disorder, but argues that this error was harmless, because the ALJ later adopted the testimony of Dr. Lewy, in which he accounted for the claimant's anxiety in assessing his mental functional limitations. It is true that the ALJ adopted the limitations testified to by Dr. Lewy in assessing the claimant's RFC. However, it is not clear those limitations accurately describe all of those stemming from the claimant's anxiety-related disorders, including his PTSD. As just discussed, Dr. Seibel found that the claimant's focus, concentration, pace and persistence were mildly to moderately impaired in part due to his anxiety. While the limitations assessed by the ALJ arguably may encompass this finding, the Court disagrees with the ALJ that they necessarily take into account Dr. Seibel's additional opined limitation that the claimant's mental disorders likely would result in difficulty tolerating work stress.

The Court further notes, as pointed out by plaintiff and as discussed above, that Dr. Seibel assessed plaintiff with a GAF score of 45, indicating serious impairment in social or occupational functioning, such as the inability to keep a job. Also as discussed above, the ALJ rejected that score because it is subjective, and because medical and social factors are taken into consideration in its assessment. It is unclear, though, on exactly what basis Dr. Seibel assessed the GAF score that he did. That is, there is no indication that Dr. Seibel gave such consideration to those factors, or, if he did, that he placed more importance on them than he did to his overall evaluation of the claimant's mental impairments and limitations. In addition, although a GAF score may be subjective in nature, it is "relevant evidence" of the ability to function mentally, which may be "of considerable help" in assessing a claimant's RFC. Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007); England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007); Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002).

V.      The ALJ Erred in Assessing Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as

long as that determination is supported by substantial evidence. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." <u>Id.</u>; <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." <u>Lester</u>, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. <u>O'Donnell v. Barnhart</u>, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. <u>Id.</u>

In her decision, the ALJ stated that "[i]f the claimant stopped the substance use," his "medically determinable impairments could reasonably be expected to produce some symptoms, but the subjective reports concerning the intensity, persistence and limiting effects of the psychiatric symptoms are not entirely credible. Tr. 18-19. Plaintiff argues this credibility determination was improper, because it lacks any reference to the evidence in the record that undermines the claimant's complaints. The Court agrees. As noted above, to discount a claimant's credibility, an ALJ must provide specific and legitimate reasons for doing so, and, as in this case where there is no affirmative evidence of malingering, those reasons also must be clear and convincing.

Defendant argues the ALJ did give such reasons here, claiming she found that with the presence of substance abuse, the claimant was "generally credible" in regard to his report of "significant difficulty with focus, attention, and social interaction" (<u>see</u> Tr. 15), but that he was "not entirely credible" with respect to "the intensity, persistence and limiting effects of" his "psychiatric symptoms" without such abuse (<u>see</u> Tr. 18-19). But there is no specificity in either of the ALJ's statements, and they certainly do not constitute, without more, clear and convincing reasons. Defendant also asserts the ALJ noted the claimant's "sketchy

and intermittent" work history in discounting the claimant's credibility. Tr. 19. But the ALJ mentioned the claimant's sparse work history only for the purpose of rebutting the assertion of his attorney that substance abuse was not a material factor to the determination of disability, because he had demonstrated the ability to work while still using drugs. See id.

VI.     The ALJ Failed to Properly Consider the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

The record contains statements from two lay witnesses, the claimant's father and one of his friends. See Tr. 128-45. Those statements contain observations of plaintiff's behavior, symptoms and functional limitations. Id. Plaintiff argues the ALJ erred in failing to mention those statements and observations at all in her decision. The Court agrees. As noted above, while the ALJ need not provide reasons for rejecting lay witness evidence with the specificity required for discounting a claimant's credibility, the ALJ at the very least must provide some germane reason or reasons for doing so. The ALJ did not do so here, which was error.

Defendant argues this failure on the part of the ALJ to consider the lay witness statements resulted in harmless error, asserting that no reasonable ALJ would reach a different determination by crediting those statements. However, this ignores the fact that the claimant's father, for example, stated that the claimant had "many sleepless nights," was "very irresponsible with money," did not listen or follow rules, and was angry and had "violent mood swings." Tr. 138, 140-42. The claimant's father further stated that his mental condition affected his memory and concentration, as well as his ability to follow instructions and get along with authority figures and others. Tr. 142. He also stated that the claimant would talk to and cut himself, and got agitated in response to stress. Tr. 143.

The claimant was noted by his friend to exhibit paranoid behaviors, have abnormal personal care

habits, get "distracted easily," have memory problems, and hide "as much as possible." Tr. 129-32. The claimant's friend also stated that he did not like people, was hard to talk to, had difficulties concentrating, completing tasks, understanding what was being said to him, and following instructions, ranted "about nonsense a lot," and, again, had problems getting along with authority figures and others. Tr. 133-34. It clearly is reasonable to assume that had the ALJ considered the statements from the claimant's friend and father, she might have come to a different conclusion regarding the claimant's mental impairments and limitations. Accordingly, the ALJ's error in failing to consider any of those statements was prejudicial to the claimant, and therefore not harmless.

VII.     The Hypothetical Question the ALJ Posed to the Vocational Expert Was Unreliable

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

In this case, the ALJ posed a hypothetical question to the vocational expert at the second hearing, which contained substantially the same limitations as those included in the claimant's residual functional capacity assessment. Tr. 311. In response to that hypothetical question, the vocational expert testified that an individual with the claimant's assessed limitations would be able to perform his past relevant work. Tr. 311-12. Based on the vocational expert's testimony, the ALJ found the claimant would have been capable of performing his past relevant work. Tr. 19.

Plaintiff argues the hypothetical question the ALJ posed to the vocational expert did not take into account all of the claimant's non-exertional limitations. The Court agrees. Given that, as discussed above, the ALJ erred in evaluating the medical and lay witness evidence in the record and assessing the claimant's credibility, it is unclear as to wether the hypothetical question posed by the ALJ contained all of his mental functional limitations. Accordingly, it cannot be said that the testimony the vocational expert provided in

1  response to that question is reliable.

2      Plaintiff further points out that in response to the question of whether an individual with the mental

3  functional limitations two state agency non-examining psychologists in the record, Timothy Gregg, Ph.D.,

4  and Thomas Clifford, Ph.D., found the claimant had based on their review of the record (Tr. 196-97), the

5  vocational expert testified that such an individual would not be able to maintain employment (Tr. 313-14).

6  It is not clear, however, whether the ALJ would be required to adopt all of the mental functional

7  limitations they found, given the conflicts and ambiguities in the medical evidence discussed above, and

8  the fact that the ALJ only gave weight to their findings concerning the ability of the claimant to handle

9  work tasks, deal with "heavy work stress" and engage in social interaction. Tr. 16.  In addition, because the

10  ALJ did not go on to step five of the sequential disability evaluation process considering her determination

11  at step four, it is not clear she would have been required to find the claimant incapable of performing any

12  work based on the mental functional limitations Drs. Gregg and Clifford found.

13  VIII.   This Matter Should Be Remanded for Further Administrative Proceedings

14      The Court may remand this case "either for additional evidence and findings or to award benefits."

15  Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

16  except in rare circumstances, is to remand to the agency for additional investigation or explanation."

17  Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in

18  which it is clear from the record that the claimant is unable to perform gainful employment in the national

19  economy," that "remand for an immediate award of benefits is appropriate." Id.

20      Benefits may be awarded where "the record has been fully developed" and "further administrative

21  proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

22  1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

23          (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
            evidence, (2) there are no outstanding issues that must be resolved before a
24          determination of disability can be made, and (3) it is clear from the record that the ALJ
            would be required to find the claimant disabled were such evidence credited.
25  Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because,

26  as discussed above, issues still remain with respect to the medical and lay witness evidence in the record

27  regarding the claimant's mental impairments and limitations, as well as his credibility, residual functional

28  capacity and ability to perform other jobs existing in significant numbers in the national economy, remand

of this matter to the Commissioner for further administrative proceedings is appropriate.

Plaintiff argues that on remand, this matter should be given to a different ALJ. However, the Court finds plaintiff has not made a sufficient showing to warrant ordering assignment to another ALJ, and thus shall leave it to the Commissioner to determine the appropriateness of doing so. Such an order would be appropriate when, say, an ALJ has been shown to be biased toward a claimant. This is because due process requires "impartiality on the part of those who function in judicial or quasi-judicial capacities." Schweiker v. McClure, 456 U.S. 188, 195 (1982). Hearing officers who decide social security claims are presumed to be unbiased. Id. This presumption, though, "can be rebutted by a showing of conflict of interest or some other specific reason for disqualification." Id.

The burden of establishing a disqualifying interest "rests on the party making the assertion." Id. at 196. That party must show "the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'" Rollins v. Massanari, 246 F.3d 853, 858 (9th Cir. 2001) (citing Liteky v. United States, 510 U.S. 540, 555-56 (1994)). Further, "actual bias," rather than the "mere appearance of impropriety," must be shown in order to disqualify an ALJ. Bunnell v. Barnhart, 336 F.3d 1112, 1115 (9th Cir. 2003). Thus, mere errors in law or application of the law to the facts are insufficient to establish the requisite actual bias. Plaintiff has not met her burden in this case. Indeed, she has made no showing of such bias. Again, this does not mean that the Commissioner is prohibited from reassigning this matter on remand if deemed appropriate, just that there is no requirement to do so.

CONCLUSION

Based on the foregoing discussion, the Court finds the ALJ improperly determined plaintiff was not disabled. Accordingly, the ALJ's decision hereby is REVERSED and REMANDED to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

DATED this 20th day of May, 2009.

Karen L. Strombom
United States Magistrate Judge